## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **GREGG SAMUEL GIORDANO** | ) | **Case No. 10-12456-BFK** |
| | ) | **Chapter 7** |
| Debtor | ) | |
| | ) | |
| **DATA MOUNTAIN SOLUTIONS,** | ) | |
| **INC.,** *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | **Adversary Proceeding No. 10-01263** |
| | ) | |
| **GREGG SAMUEL GIORDANO** | ) | |
| | ) | |
| Defendant | ) | |

### MEMORANDUM OPINION

This matter came before the Court on the Complaint of Data Mountain Solutions, Inc.

("DMS") and Derek McUmber to determine the dischargeability of certain debts owed to them

by the Debtor, Mr. Giordano, as of the date of the filing of Mr. Giordano's bankruptcy petition.

For the reasons stated below, the Court holds that: (a) $5,000 is non-dischargeable, pursuant to

11 U.S.C. §§ 523(a)(4) and (a)(6); (b) the amounts of $166,957 payable to DMS, plus interest at

6% from July 2008, and $120,083 payable to Mr. McUmber, plus interest at 6% from July 2008,

are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6); (c) any additional damages

accruing after July 2008 have not been proven, and hence, are dischargeable; and (d) the

Plaintiffs' claim for their post-arbitration award of attorney's fees are dischargeable.

The case was tried over the course of five days in November, December 2011 and January 2012. This Memorandum Opinion constitutes the Court's findings of facts and conclusions of law under Bankruptcy Rule 7052.

### Findings of Fact

1. Data Mountain Solutions, Inc. ("DMS") is a West Virginia corporation, originally organized by Mr. Hill and Mr. Watson.

2. In June 2003, Mr. McUmber was employed by a company known as Web Putty. Web Putty was in danger of running out of money, and Mr. McUmber was looking for employment and other business opportunities. He was introduced to Mr. Giordano. On June 2, 2003, Mr. McUmber became a shareholder of DMS.

### The DMS Shareholders Agreement

3. On June 2, 2003, the four shareholders of DMS – Mr. McUmber, Mr. Giordano, Mr. Watson, and Mr. Hill – entered into a Shareholders Agreement. Plaintiffs' Exh. 2. Each shareholder initially owned 22,500 shares in the company. Further, the parties agreed that Mr. Watson and Mr. Hill would hold officer positions within the company, as follows:

> President: Frederick S. Hill, Jr.
>
> Vice President: Anthony Watson
>
> Secretary: Anthony Watson
>
> Treasurer: Frederick S. Hill, Jr.

Defendant's Exhibit P.

4. The company's June 2, 2003, Organizing Resolution also acknowledged that Mr. Watson had loaned $28,406 to the company. Defendant's Exh. P.

5. The parties agreed that each shareholder would be a Director.  Defendant's Exh. M, Shareholders Agreement, ¶ 1(a).  Collectively, the four individuals constituted the company's Board of Directors.  *Id.*  Furthermore, under the company's Bylaws, the Chairman had the ability to cast the deciding vote in order to break any tie votes of the Board.  Defendant's Exh. N, § 2.12.

6. Under the Bylaws, each Director would continue to serve until his successor was elected and qualified.  *Id.* at § 2.3.  However, the same provision does not appear in Section 2.5 relating to the position of Chairman.  Accordingly, it was the view of the company's counsel, Mr. Thompson, that, by the Board Meeting of May 25, 2006 (discussed below), there was no Chairman to break a deadlock of the Board.

7. Further, under the Shareholders Agreement, each Director would remain a Director as long as the Director was a shareholder of the company, even if the shareholder owned only one share (a fact which would come to have significance as the shareholders grew more distant and mistrustful of each other).  Defendant's Exh. M, § 1(b).

**The Blue Pages and Dot Gov Contracts**

8. In 2003 and 2004, DMS did not have the ability to contract directly with the Government Services Administration (GSA) because it lacked what is known as a GSA Schedule.  Accordingly, DMS teamed up with a company known as Native Technology, Inc. ("NTI"), which not only had a GSA Schedule, but had the further advantage of being a Section 8(a) minority-owned business enterprise, which enabled NTI to obtain contracts from GSA without competitive bidding.

9. NTI had a contract with GSA for what was known as the Blue Pages contract, which was essentially an online telephone directory for government agencies.  There were two task orders under the Blue Pages contract, Blue Pages I and Blue Pages II.

10. On or about January 13, 2003, Mr. Giordano, acting on behalf of a company that he called "Wave Interface/DMS," entered into a Teaming Agreement with NTI.  Defendant's Exh. A, Teaming Agreement.  The Teaming Agreement has an "Exhibit A" attached to it, which purports to allocate 47 ½% of the Blue Pages (and any other, future contracts) to "Wave/DMS" (for our purposes, DMS) for the provision of technical services, and 47 ½% to Mr. Giordano for Project Management.  *Id.* at Exhibit A to Defendant's Exh. A, Teaming Agreement.

11. Mr. Giordano maintains that he disclosed the Teaming Agreement to the other DMS shareholders, and that they were aware of its terms.  However, there is no evidence (e.g., e-mails or correspondence) to support the purported disclosure of the Teaming Agreement to the other shareholders, and shareholders Hill and McUmber maintain that they did not see the Teaming Agreement until the parties were engaged in arbitration proceedings and it was produced in discovery.  The Court finds that Teaming Agreement was never disclosed to the other shareholders of DMS, was never presented to the DMS Board for approval, and was not known to the other shareholders of DMS until it was produced in discovery when the parties later became litigants in arbitration against each other.

12. In May 2004, the GSA awarded NTI a contract known as the Dot Gov contract.  In essence, this contract was for the management and routing of all e-mail traffic under the ".gov" top level domain for the U.S. government, as well as for State and local governments that used the .gov domain.  The Contract was initially for a two-year period, with 3 one-year option periods.  It was set to expire at the end of 2009, but was extended through February 2011.

4

13. NTI did not have the ability to perform the requirements of the Dot Gov contract, so it teamed up with DMS for this purpose. Under the Teaming Agreement between NTI and DMS, NTI was to receive 5% of the revenue from the contract, and DMS was to receive 95% of the revenue. Defendant's Exh. A. The parties further agreed that Mr. McUmber and Mr. Giordano would act as contract employees for NTI, and that Mr. McUmber and Mr. Giordano would receive 1099 income tax statements from NTI. Plaintiffs' Exhs. 8-9 (McUmber and Giordano 1099s). Under this arrangement, Mr. McUmber and Mr. Giordano would each receive 23% of the revenue of the contract, after the payment of expenses, and DMS would receive 49%. The revenue was consistently divided among the three parties on that basis (with the exception of the first two Dot Gov Contract payments) from the inception of the Contract through June 2006. Plaintiffs' Exhs. 4-9.[1]

14. For purposes of the Dot Gov contract, Mr. McUmber acted as the technical manager, with day-to-day responsibility for keeping the system up and running, answering help desk calls, and trouble shooting. Mr. Giordano acted as the project manager, interfacing in meetings with NTI and GSA, picking up the checks from NTI on a monthly basis, depositing the checks into the company's bank account, and distributing the money to DMS, Mr. McUmber and himself in the agreed-upon percentages, 49%, 23% and 23% respectively. The parties – DMS and Mr. McUmber – entrusted Mr. Giordano with the responsibility of picking up the checks and distributing the funds in the agreed-upon amounts.

---

[1]   Mr. Giordano and Mr. McUmber needed to be "1099" employees of NTI in order to satisfy federal contracting regulations. These amounts, together with NTI's 5%, would keep 51% of the revenue in NTI (at least for the sake of appearances).

**DMS Re-Acquires Mr. Hill's Shares**

15. On May 1, 2004, DMS reacquired 11,250 of Mr. Hill's shares in the company.
Defendant's Exh. Q, p. 1.

16. On May 10, 2005, DMS reacquired an additional 3,756 of Mr. Hill's shares in the
company. *Id* at p. 4.

17. The net effect of these two transactions was that Mr. Hill was left with 7,494 shares
in DMS.

18. Throughout this period, Mr. Hill became interested in business opportunities
unrelated to DMS. By July 2004, he had resigned as an officer of the corporation. However, he
remained a director of DMS.

**Mr. Giordano's Attempt to Gain Control of DMS, and
The May 25, 2006, Board Meeting**

19. Beginning in early (February or March) 2006, Mr. McUmber and Mr. Hill began to
grow dissatisfied with Mr. Giordano's management of DMS's finances. Specifically, Mr.
McUmber and Mr. Hill grew concerned that: (a) it appeared that critical vendors (Zone Edit and
Navisite) were not being paid, and if they terminated their agreements with DMS, the system
could not function; (b) Mr. McUmber noticed that certain payments, totaling $6,000, were
apparently made to family members of Mr. Giordano; (c) Mr. Hill was concerned that the
company was not current in its tax obligations; and (d) Mr. Hill and Mr. McUmber were both
concerned that the monthly payments from NTI weren't being deposited into the company bank
account at United Bank.

20. Moreover, the shareholders had discussed, but had never concluded, an agreement for
the purchase of Mr. Watson's shares in DMS. Mr. Watson was embarking on a course of study

at Harvard University, and did not have time to devote to the affairs of DMS.   Mr. Watson

wanted the company to repurchase his shares.  He also wanted control of the intellectual property

known as Securecabinet, which was owned by DMS, and to which he had devoted his efforts

while at DMS.

21. On May 22, 2006, Mr. Hill sent out a proposed Agenda for a Board meeting

scheduled for May 25th.  Defendant's Exh. A-Q.  The proposed Agenda prompted a number of

e-mails among the shareholders as to what was to be discussed at the meeting.  The reacquisition

of Mr. Watson's shares in the company was on the Agenda, as was the reacquisition of Mr. Hill's

remaining shares.[2]

22. Although not formally noticed as such, this Board meeting was a special meeting of

the Board, pursuant to Section 2.8 of the Bylaws.  Defendant's Exh. N, § 2.8.

23. Mr. Giordano maintained at trial that this was both a Board meeting and a special

meeting of the shareholders.  However, Mr. Hill's e-mail of May 22, 2006, and the attached

Agenda, both reference only a Board meeting, and not a shareholders meeting.  Defendant's Exh.

AQ.  Further, other shareholders, notably Mr. and Mrs. Millheiser, Luman, Lange and Wheeler,

LLP, and Christopher Wheeler, did not have any notice of the meeting as a shareholders meeting.

Another shareholder, Luman, Lange, Thomas & McMullen, LLP, arguably did have notice

because Mr. Thomas, the company's corporate counsel, attended the meeting.  The Court finds

that this was a Board meeting only, and not a shareholder's meeting.  This conclusion is

bolstered by Mr. Hill's e-mail of April 27, 2006, to Mr. Thomas, the company's corporate

---

[2]   The company had previously tried to reacquire Mr. Watson's shares (Defendant's Exh. R), but the issue of the
Securecabinet intellectual property was never resolved to anyone's satisfaction, and the acquisition transaction was
never consummated.

counsel, in which Mr. Hill stated that "I only want Board members present for this meeting," and

that the shareholders would later be brought up to date.  Defendant's Exh. X.

24. On May 24, 2006, Mr. Giordano deposited two checks, in the amounts of $21,614

and $43,228, into the company's bank account at United Bank.  Plaintiffs' Exhs. 11-12.  These

funds represented one month's and two months' revenue from NTI on the Dot Gov contract,

respectively.[3]

25. On the same day, May 24th, Mr. Giordano wrote two checks on the company's

United Bank account, in the amounts of $40,000 and $20,000.  Plaintiffs' Exh. 14.  With the

$40,000 check, Mr. Giordano purchased a $35,000 cashier's check, payable to himself.  With the

$20,000 check, Mr. Giordano purchased a $20,000 cashier's check, payable to Mr. Watson.  Mr.

Giordano endorsed the $35,000 cashier's check, and delivered it to Mr. Watson, in an attempt to

purchase 22,499 of Mr. Watson's 22,500 shares in DMS.  Plaintiffs' Exh. 15; Defendant's Exh.

Y, Watson – Giordano Stock Purchase Agreement.  Mr. Giordano further delivered the $20,000

cashier's check to Mr. Watson in satisfaction of Mr. Watson's loan to the company and unpaid

expenses.[4]

26. Mr. Giordano maintained at trial that the $40,000 check was a bonus.  However, the

bonus was not authorized by the company's Board of Directors, and was unknown to the Board

at the time Mr. Giordano withdrew the funds.  Moreover, the Board did not authorize the

$20,000 payment to Mr. Watson in satisfaction of his loan and expenses.

---

[3]  The deposit of three months' worth of checks on the same day confirmed Mr. Hill's suspicions that Mr. Giordano
was not depositing revenue from the Dot Gov Contract into the company bank account at United Bank on a timely
basis.
[4]   According to the testimony of Mr. McUmber, which the Court credits on this issue, Mr. Giordano advised the
other shareholders that the funds were "untraceable."  This, the Court finds, was Mr. Giordano's reason for
exchanging the two company checks for cashier's checks – in Mr. Giordano's view, this would make the funds
untraceable to the other shareholders (it did not, of course, it just made it more difficult for Mr. McUmber and Mr.
Hill to trace the funds).

27. The Board of Directors met the next day, on May 25, 2006.  At the start of the meeting, Mr. Giordano announced that he had paid himself a bonus, and that he had acquired Mr. Watson's shares in the company.  This, in Mr. Giordano's view, gave him a majority of shares in the company, owing to the company's prior acquisition of Mr. Hill's 15,006 shares.  Further, the obvious purpose of leaving Mr. Watson with one share was to keep him on the Board as a voting Board member, so that these actions could be ratified, if necessary.[5]

28. Needless to say, Mr. Giordano's unilateral payment of the $40,000 bonus and his attempted purchase of Mr. Watson's shares were viewed with suspicion and anger by Mr. McUmber and Mr. Hill.  Mr. McUmber and Mr. Hill maintained that: (a) the $40,000 bonus was unauthorized; and (b) Mr. Giordano's attempted acquisition of the Watson shares violated the DMS Shareholder Agreement.

29. Mr. Giordano attempted to turn the Board meeting into a shareholder's meeting, maintaining that he now owned 60% of the company's shares, and that Mr. Hill and Mr. McUmber owned the remaining 40%, despite the fact that notice of the meeting had not been sent to all of the shareholders.  Mr. Giordano took a vote of the shareholders present, and announced that he had a 60% majority to ratify his actions.  Later, Mr. Giordano purportedly "rescinded" his purchase of Mr. Watson's shares, and Mr. Watson promised to pay back the $35,000.  However, this money was never repaid by Mr. Watson.

30. Subsequent to the May 25th Board meeting, matters only grew worse among the shareholders.  Mr. Giordano, who was the individual responsible for picking up the checks from NTI, began to withhold the checks and did not deposit them into the company's United Bank

---

[5]  Mr. Giordano testified that Mr. Watson wanted to keep one share in the company for "sentimental" reasons, and that it was just "fortuitous" that the retention of one share allowed Mr. Watson to continue to vote as a Director. The Court finds that this statement lacked any semblance of credibility.  The Court finds that the purpose of leaving one share with Mr. Watson was for the purpose of keeping him on the Board as a voting member.

account.  In December 2006, Mr. Giordano opened two bank accounts at Bank of America in the

name of DMS, and began depositing the NTI money there.  Plaintiffs' Exh. 40.  Mr. Giordano

did not, however, pay any of the company's ongoing monthly expenses out of this bank account.

Further, and importantly, Mr. Giordano began requesting the funds from NTI, and, at Mr.

Giordano's request, NTI began paying the contract proceeds on the basis of 47 ½% to DMS and

47 ½% to Mr. Giordano – the result, according to Mr. Giordano, of his decision to "go back to"

the literal terms of the Subcontract Agreement (Exhibit A to Defendant's Exh. A, Teaming

Agreement) with NTI.  Throughout the trial, Mr. Giordano's position was that the consistent

payment of the Dot Gov Contract proceeds on a 49% (DMS), 23% (Giordano) and 23%

(McUmber) basis was a matter of his own largesse, calling it at one point an "at will

contribution."  This is flatly contradicted by the arbitrator's Modified Final Award, discussed

below, which found an enforceable agreement among these three parties dating back to "at least

May 2004."  Plaintiffs' Exh. 22, § 9.

### The U.S. District Court Litigation and the Arbitration

31. On September 24, 2006, DMS, Mr. McUmber, and Mr. Hill filed a Complaint in the

U.S. District Court in the District of Columbia against Mr. Giordano and Mr. Watson (as well as

against Mr. Thompson, the company's counsel).  Defendant's Exh. E.

32. On May 11, 2007, Mr. Giordano demanded arbitration with the American Arbitration

Association, pursuant to the terms of the Shareholders' Agreement.  Defendant's Exh. G.

33. On May 18, 2007, DMS responded with its own demand for arbitration.  Defendant's

Exh. F.[6]

---

[6]  The demand for arbitration appears to have been signed on February 26, 2007, but it is file-stamped May 18, 2007.

34. The parties proceeded to arbitration, and on November 14, 2008, the arbitrator issued his Modified Final Award.  Defendant's Exh. B; Plaintiffs' Exh. 22.

35. In the Modified Final Award, the arbitrator determined and ordered the following:

- Mr. Watson was ordered to sell, and the company was ordered to purchase, the 22,500 Watson shares in DMS.  The purchase price was deemed to have been satisfied in full with the $55,000 in funds taken by Mr. Giordano and paid over to Mr. Watson on May 24, 2006.

- Mr. Hill was ordered to sell, and the company to purchase, 15,006 of Mr. Hill's shares, for the purchase price of $51,020, which Mr. Hill had previously received from the company.

- As a result, the following parties were deemed to be shareholders of the company, in the following share amounts:

    | | |
    |---|---|
    | Hill | 7,494 |
    | Giordano | 22,500 |
    | McUmber | 22,500 |
    | Millheiser | 1,000 |
    | Luman, *et al.* | 140 |
    | Luman, *et al.* | 52 |
    | Wheeler | 42 |

- There was a valid agreement between DMS, Giordano, and McUmber, dating back to at least May 2004, in which the three parties agreed to share the revenue from the Dot Gov contract in the following amounts:

    | | |
    |---|---|
    | DMS | 49% |
    | McUmber | 23% |
    | Giordano | 23% |

- DMS and McUmber had not received the full amount to which they were entitled under this agreement.  The arbitrator ordered Mr. Giordano to pay the following

11

amounts to DMS and Mr. McUmber: (a) "$166,957.19 (representing DMS's portion of the overpayment to Mr. Giordano through July 2008), plus any additional amounts that Giordano has received that DMS should have received pursuant to the foregoing percentages plus interest on the total at the rate of six percent (6%) per annum;" and (b) "$120,083.00 (representing McUmber's portion of the overpayment to Giordano through July 2008), plus any additional amounts that Giordano has received that McUmber should have received pursuant to the foregoing percentages plus interest on the total at the rate of six percent (6%) per annum."

- For reasons that remain unclear, DMS was ordered to pay both its own legal fees, and the legal fees of Mr. Giordano's counsel.

36. The arbitrator's award was confirmed and entered as a final Judgment of the U.S. District Court for the District of Columbia on January 15, 2010 (hereinafter, the "D.C. Judgment"). Plaintiffs' Exh. 24. The Judgment remains unsatisfied.

### THE NTI Interpleader Action

37. In the meantime, NTI, apparently increasingly concerned with the DMS shareholder disputes, filed an action for interpleader in the Circuit Court of Fairfax County, Virginia.

38. On July 20, 2007, the Circuit Court of Fairfax County entered a Consent Order of Interpleader, under which the proceeds of the Dot Gov contract would be paid into the registry of the Court. Defendant's Exh. A-I.

### The Giordano Bankruptcy Filing

39. On March 30, 2010, Mr. Giordano filed a voluntary petition under Chapter 7, in this Court.

12

40. DMS, Mr. McUmber, and Mr. Hill filed a timely Complaint to determine the dischargeability of the debts represented by the arbitration award (and thereafter).[7]

41. DMS and Mr. McUmber also filed Proofs of Claim (Claim Nos. 8 and 9, respectively), asserting that DMS is owed $377,259, and that Mr. McUmber is owed $434,965. Plaintiffs' Exhs. 34-35. The DMS Proof of Claim also includes $153,116 in post-arbitration, pre-bankruptcy petition legal fees for the collection efforts undertaken by DMS's attorneys on the arbitration award / U.S. District Court Judgment.

## Conclusions of Law

This is an action to determine the dischargeability of debts under Section 523 of the Bankruptcy Code. The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the Order of Reference from the United States District Court for the Eastern District of Virginia, dated August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). The Plaintiffs bear the burden of proof on all issues under Section 523 of the Code. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The standard of proof is a preponderance of the evidence. *Id*.[8]

---

[7]  The introduction to the Complaint references Section 727 of the Bankruptcy Code, the general objection to discharge statute. However, none of the Counts are stated under Section 727. All of the Counts are stated under Section 523, the dischargeability provisions of the Code. Mr. Hill was dismissed as a Plaintiff by Order of the Court on September 10, 2010. Docket No. 10.

[8]  The Defendant maintained at trial that the standard is "clear and convincing evidence" under Count II, the 523(a)(4) Count (fraud or defalcation while acting in a fiduciary capacity). The Court can discern no reason why a dischargeability action under Section 523(a)(2)(A) should have a lesser standard of proof than one under Section 523(a)(4), and the Court will apply the preponderance standard to all Counts. *See FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615 (5th Cir. 2011) (applying the preponderance standard to a Section 523(a)(4) claim); *Patel v. Shamrock Floorcovering Servs. (In re Patel)*, 565 F.3d 963 (6th Cir. 2009) (same). The Supreme Court in *Grogan v. Garner* noted that there are no burden of proof distinctions among the various subsections of Section 523. *See Grogan v. Garner*, 498 U.S. at 287 ("Our conviction that Congress intended the preponderance standard to apply to the discharge exceptions is reinforced by the structure of § 523(a), which groups together in the same subsection a variety of exceptions without any indication that any particular exception is subject to a special standard of proof"). Accordingly, the Court will apply the preponderance standard to all Counts.

13

The Supreme Court has made it clear that collateral estoppel principles apply in Section 523 dischargeability cases. *Grogan v. Garner,* 498 U.S. 279, 284-85 (1991). As well, collateral estoppel applies in dischargeability cases with respect to arbitration awards. *See, e.g.*, *Stasz v. Eisenberg (In re Stasz)*, 352 Fed.Appx. 154 (9th Cir. 2009); *Bard v. Appel (In re Appel)*, 315 B.R. 645 (E.D.N.Y. 2004); *Roth v. McCartin (In re McCartin),* No. 10-59014, 2011 WL 2443717 (Bankr. S.D. Ind. June 14, 2011); *Tatge v. Chandler (In re Judiciary Tower Assocs.)*, 175 B.R. 796 (Bankr. D.D.C. 1994).

"The preclusive effect of a federal court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). Issue preclusion, or collateral estoppel, bars the "'successive litigation of an issue of fact or law litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* at 892 (citing *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). In the D.C. Circuit, where this arbitration award was confirmed, a final arbitration award has collateral estoppel and res judicata preclusive effects. *Camp v. Kollen*, 567 F.Supp.2d 170, 174 n.6 (D.D.C. 2008) (unconfirmed arbitration award given collateral estoppel effect (citing *Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. 'Rosvoorouzheinie'*, 172 F.Supp.2d 79, 95-96 (D.D.C.2001))); *see also Hammad v. Lewis,* 638 F.Supp.2d 70, 74 (D.D.C. 2009) ("Decisions of an arbitration panel normally provide the type of finality sought by courts to be protected by collateral estoppel").

For collateral estoppel to apply under District of Columbia law, the following elements must be established:

> (1) the same issue must have been contested by the parties and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case; and (3) preclusion in

14

the second case must not work a basic unfairness to the party bound by the first
determination.

*Johnson v. Sullivan*, 748 F.Supp.2d 1, 10 (D.D.C. 2010) (citing *Martin v. Dep't of Justice*, 488

F.3d 446, 454 (D.C. Cir. 2007)).

In this case, the parties arbitrated many (though not all) of the issues, and the U.S.

District Court for the District of Columbia confirmed the arbitration award.  The arbitration

award is clear in certain respects, as stated above.  *See supra* pp. 11-12, ¶ 35.  The Court is

required to accept, and does accept, these findings as a matter of collateral estoppel.  There has

been no showing, however, that the issues relating to the non-dischargeability of the obligations,

that is, the fraud-based issues, were actually litigated in the arbitration.  Specifically, the

arbitrator made no findings as to whether the debt was the product of actual fraud, whether the

Debtor willfully and maliciously damaged the Plaintiffs' property, or whether the debt was the

product of a defalcation while acting in a fiduciary capacity.  It is the task of this Court to

determine whether or not the amounts represented by the arbitration award are dischargeable

under Section 523 of the Bankruptcy Code.  Further, it is this Court's obligation to determine, if

the arbitration award is found to be non-dischargeable, the extent to which the award may be

non-dischargeable – i.e., the amount of damages that may be non-dischargeable.

     I.       *Count I – 11 U.S.C. § 523(a)(2)(A) (Money Obtained through False Pretenses,
              False Representation, or Actual Fraud).*

The Court will first address Count I, the Plaintiffs' claim that the Debtor's debts to them

are excepted from discharge as money and services obtained by "false pretenses, a false

representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).  The Fourth Circuit has stated that,

"[f]or a debt to fall within this exception, money, property or services, or an extension, renewal

or refinancing of credit must actually have been obtained by the false pretenses or

15

representations or by means of actual fraud." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d

215, 219 n.1 (4th Cir. 2007) (citing Collier on Bankruptcy, ¶ 523.08[1][b] (15th ed., rev. 2004)).

To prevail on a claim of actual fraud, the plaintiff "must prove four elements: (1) a fraudulent

misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the

plaintiff; and (4) the Plaintiff's justifiable reliance on the misrepresentation." *Foley & Lardner*

*v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999).  The burden of proof is on the

objecting creditor, and the standard of proof is preponderance of the evidence.  *See supra* p. 13;

*Grogan v. Garner*, 498 U.S. 279, 291 (1991).

A.  *The $40,000 and the $20,000 Checks.*

The Plaintiffs spent an *enormous* amount of trial time focused on the Debtor's

procurement of the two bank checks, in the amounts of $40,000 and $20,000, and on the

Debtor's delivery of the two checks to Mr. Watson in exchange for Mr. Watson's stock.  The

Debtor testified that he paid $35,000 to Mr. Watson for his stock, which came from the first

check, and that he resolved Mr. Watson's loan and expense claims against DMS for $20,000,

which came from the second check.  The Debtor acknowledged that he kept the remaining

$5,000 from the first check.  The Debtor testified that he did this with the understanding that,

after the repurchases of the Hill stock by the company, he and Mr. Watson would own a majority

of the shares in DMS.  The so-called "bonus" of $40,000 taken by the Debtor was inarguably an

unauthorized act of which none of the other directors (other than Mr. Watson) had any advance

knowledge and of which they certainly would not have approved.  In essence, this was a naked

power grab by the Debtor in derogation of his fundamental obligations of fairness and disclosure

to his co-directors and shareholders.  He did it in a surreptitious way in order to avoid the money

being traced.  *See supra* p. 8, n.4.  He did it in advance of the Board meeting, not after.  And he

16

did it in such a way as to keep Mr. Watson on the Board, by ensuring that Mr. Watson retained a

single share of the company. *See supra* p. 9, n.5.

However, at the end of the day, DMS and Mr. McUmber have no claim arising out of the

$40,000 and $20,000 transactions other than the $5,000 retained by Mr. Giordano.  This is

because the arbitrator ruled that $55,000 was to be credited to the purchase of Mr. Watson's

shares by DMS.  Defendant's Exh. B, § 3(a) ("The Watson Share Purchase Price shall be deemed

to be paid in full by (i) the US$55,000 received by Watson from DMS funds paid directly or

indirectly via Giordano on or about May 24, 2006, plus accrued interest thereon, and (ii) the

transfer of 100% of the shares owned by DMS in Securecabinet, which transfer occurred no later

than fiscal year 2005").  DMS appears to have conceded the point as, in it its Proof of Claim, it

identified only $5,000 as the amount of the Fairfax Judgment (plus the arbitration award amounts

having to do with the Dot Gov contract funds).  Plaintiffs' Exh. 34.  With respect to the $20,000

check, the Court finds that the Debtor's testimony that this amount satisfied Mr. Watson's loan

and expenditure claims is unrebutted.

The Court finds that that the remaining $5,000 is not exempt from dischargeability under

Section 523(a)(2)(A).  Although the Debtor took this money without the other shareholders and

directors knowing it at the time, he made no misrepresentations at the time.  In fact, no one knew

of the Debtor's act until the next day at the Board meeting.  As well, DMS and McUmber were

not induced to act, or not to act, and they did not rely in any way on any misrepresentations of

the Debtor with respect to the $5,000.  The Court cannot find that the Debtor made any

misrepresentations, nor any reliance by the Plaintiffs.  The $40,000 check and the $20,000 check

(including the $5,000 retained by the Debtor) are not exempt from dischargeability under Section

17

523(a)(2)(A).  Rather, the $5,000 claim is better addressed under Counts II and III (11 U.S.C. §

523(a)(4)), and Count IV (11 U.S.C. § 523(a)(6)), below.

     *B.   The Dot Gov Contract Proceeds.*

     The Plaintiffs proved at trial (and at the arbitration) that they had an agreement with the

Debtor to split the Dot Gov contract proceeds on a 49% (DMS), 23% (McUmber), 23%

(Giordano) basis.  The Court accepts the finding of the arbitrator that there was such an

agreement.  The Plaintiffs maintain that they were not paid in accordance with these percentages

from July 2006 (following the disastrous Board meeting of May 25th) forward.

     For purposes of Section 523(a)(2)(A), there was an agreement to pay these amounts, but

in the future.  There were no statements of *existing* fact made in support of this agreement.  A

debt can be held to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A) only if the Debtor

made the agreement to split the proceeds without the *present intent* to perform that agreement.

*Structured Invs. Co., LLC v. Dunlap (In re Dunlap)*, 458 B.R. 301, 333 (Bankr. E.D. Va. 2011)

("[T]he intent not to perform must be present at the time the future performance is promised"

(quoting *Ocean Equity Group, Inc. v. Wooten (In re Wooten)*, 423 B.R. 108, 122 (Bankr. E.D.

Va. 2010))).  Here, the Court cannot find that the agreement was made without a present intent to

perform.  In fact, the parties all agree that Mr. Giordano collected the funds from NTI and paid

out the proceeds in accordance with the foregoing percentages (49/23/23%) from the inception of

the Dot Gov contract through June 2006, with only two exceptions at the outset of the

arrangement.  There was no evidence that the Debtor never intended to perform his promises,

from the outset of the Dot Gov contract.  Consequently, the amounts awarded by the arbitrator

are not exempt from dischargeability under 11 U.S.C. § 523(a)(2)(A). Rather, these amounts are

18

better addressed under Counts II and III (11 U.S.C. § 523(a)(4)), and Count IV (11 U.S.C. §

523(a)(6)), below.

II.     *Count II – 11 U.S.C. § 523(a)(4)(Fraud or Defalcation While Acting in a Fiduciary Capacity).*

The Plaintiffs next claim that their claims are excepted from discharge because the debtor

committed defalcation while acting in a fiduciary capacity.  Among the debts excepted from an

individual debtor's discharge are debts incurred through "fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  To succeed on a claim of

fiduciary defalcation, "a creditor must ordinarily make a two-part showing: (1) that the debt in

issue arose while the debtor was acting in a fiduciary capacity; and (2) that the debt arose from

the debtor's fraud or defalcation."  *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493,

497 (4th Cir. 2008) (citation omitted).  A defalcation "'need not rise to the level of

embezzlement'" – "even an innocent mistake which results in misappropriation or failure to

account is sufficient."  *In re Uwimana*, 274 F.3d 806, 811 (4th Cir. 2001) (quoting *Pahlavi v.

Ansari (In re Ansari ),* 113 F.3d 17, 20 (4th Cir. 1997)).[9]

A.     *Was the Debtor a Fiduciary?*

The first issue to be determined is whether the Debtor occupied a fiduciary position, vis-

a-vis DMS and Mr. McUmber.  The Court finds that he did.  First, with respect to DMS, the

Debtor was a director of DMS.  Directors are unquestionably fiduciaries of the corporations they

serve.  *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266, 270-71 (4th Cir. 2002)

(looking to West Virginia law); *Janssens v. Freedom Medical, Inc.*, Civ. No. JFM-10-2042, 2011

WL 1642575, at *5 (D. Md. 2011) (the term "fiduciaries" includes directors and "and others who

---

[9]  The $20,000 and the $40,000 checks (and the resulting $5,000 liability) are addressed as a part of Count III, below.

occupy 'positions of ultimate trust'" (quoting *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 169 (Bankr. D. Md. 1999)); *Crockett v. Ferris (In re Ferris)*, 447 B.R. 516, 523-24 (Bankr. E.D. Va. 2011) (noting that "Virginia law is clear that officers and directors of corporations occupy a fiduciary relationship to the corporation and its stockholders").[10]

The Court also finds that the parties – the Debtor, DMS and Mr. McUmber – entered into a joint venture under which the Debtor would act as the manager for purposes of collecting and disbursing the funds from the Dot Gov contract. The joint venture was separate and distinct from the parties' respective shareholder interests in DMS. The Debtor was solely responsible for billing NTI on behalf of himself, DMS and Mr. McUmber. The Debtor was, similarly, solely responsible for collecting the funds from NTI and for disbursing them to DMS and Mr. McUmber. This was more than a contractual arrangement. It was, both in fact and in operation, a joint venture among the three.

"Under Virginia law, 'a joint venture exists where two or more parties enter into a special combination for the purpose of a specific business undertaking, jointly seeking a profit, gain, or other benefit, without any actual partnership or corporate designation.'" *Andrews v. Primus Telecomms. Group, Inc.*, 107 Fed. Appx. 301, 308 (4th Cir. 2004) (quoting *PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 340, 576 S.E.2d 438, 431 (2003)). Moreover, in Virginia, "joint venturers have a fiduciary relationship among themselves which 'begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and *continues until the enterprise has been completely wound up and terminated.*'" *Roark v. Hicks*, 234 Va. 470, 475, 362 S.E.2d 711, 714 (1987) (quoting *Horne v. Holley*, 167 Va. 234, 239, 188 S.E. 169, 172 (1936) (emphasis in original *Roark v. Hicks* opinion). In *Roark v.*

---

[10]   The Court in *Ferris* ultimately found that it was unnecessary to decide the issue, because it held the debt to be non-dischargeable on other grounds.

*Hicks*, the Court held that the duties and obligations of joint venturers are essentially the same as those of partners in a partnership. *Roark v. Hicks*, 234 Va. at 475, 362 S.E.2d at 714 (citing *Jackson Company v. City of Norfolk,* 197 Va. 62, 67, 87 S.E.2d 781, 785 (1955). Furthermore, the Virginia Code expressly requires partners to abide by their fiduciary duties to the partnership, requiring partners "[t]o account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property . . . ." Va. Code § 50-73.102(B)(1).

Other courts have held that a joint venture relationship is sufficient to establish a fiduciary relationship under Section 523(a)(4), particularly where the debtor is responsible for managing the venture's funds. *See Lewis v. Short (In re Short)*, 818 F.2d 693, 695-96 (9th Cir. 1987); *Pope v. Kryszak*, No. 10-C-1180, 2011 WL 4435368, at *2 (E.D. Wis. Sept. 23, 2011); *In re Hanson*, No. 11-90361-MM, 2011 WL 6148429, at *7-8 (Bankr. S.D. Cal. Nov. 21, 2011); *In re Wisell*, No. 811-08163-reg., 2011 WL 3607614, at *11-12 (Bankr. E.D.N.Y. Aug. 16, 2011); *In re Mills*, 2011 WL 6148662, at *6-7 (Bankr. D. Mass Dec. 12, 2011); *In re Duffy*, No. 08-2307, 2010 WL 3260077, at *10 (Bankr. D.N.J. Aug. 18, 2010).[11]

Here, the Court finds that there was a joint venture among the Debtor, DMS, and Mr. McUmber, which gave rise to fiduciary duties on behalf of the Debtor, specifically with respect to the funds collected from NTI and the duty to properly account for and disburse the same to the Debtor's co-venturers, DMS and Mr. McUmber.

---

[11]    The Court looks to Virginia law because this was the locus of the parties' transactions. Mr. McUmber picked up the funds from NTI in Virginia, deposited them (or not) to a bank in Virginia, and disbursed them (or not) in Virginia. The same result would obtain under the law of the State of West Virginia, DMS's state of incorporation. "A partner is a trustee for the other partners and for the partnership, he is the cestui que trust of the other partners. The relationship between partners being fiduciary, the highest degree of good faith between the partners is required." *Mullens v. Wolfe*, 120 W.Va. 672, 674, 200 S.E. 37, 38 (1938).

B.  *Did the Debtor Commit a Defalcation?*

As noted above, the term defalcation "need not 'rise to the level of embezzlement' –
"even an innocent mistake which results in misappropriation or failure to account is sufficient."
*In re Uwimana*, 274 F.3d 806, 811 (4th Cir. 2001) (quoting *Pahlavi v. Ansari (In re Ansari )*, 113
F.3d 17, 20 (4th Cir. 1997)).  The Court finds that, unquestionably, the Debtor committed a
defalcation while acting in a fiduciary capacity.  The Debtor was entrusted with the
responsibility of collecting the funds from NTI and disbursing them to DMS and Mr. McUmber
in the agreed percentages – 23% (Giordano), 23% (McUmber), and 49% (DMS).  This
agreement, the arbitrator found, went back to at least 2004.  In 2006, when the Debtor's power
play didn't work out and the parties were at a corporate standstill, the Debtor simply refused to
distribute the funds and held on to them.  Beginning in July 2006, the Debtor sought to "go back
to the Teaming Agreement," under which: (a) he paid DMS only 47 ½% (i.e., was 1 ½% short),
and (b) he paid Mr. McUmber nothing.  This was clearly a failure to account and a defalcation of
the Debtor's fiduciary duties, both to DMS and to Mr. McUmber.

C.  *To What Extent Were the Plaintiffs Harmed by the Defalcation?*

The Court finds that the Plaintiffs were harmed by the defalcation of the Debtor.  To what
extent, though, is a more difficult question.

i.      *The Pre-Arbitration Award Amounts.*

The arbitrator's award, as confirmed by the U.S. District Court, found that there was an
agreement between Mr. Giordano, Mr. McUmber, and DMS as to the split of the Dot Gov
contract proceeds.  The arbitrator further found that Mr. Giordano had been over-compensated to
the detriment of Mr. McUmber and DMS in the specific amounts found in the award.  The
arbitration award, as confirmed by the U.S. District Court, is entitled to collateral estoppel effect

22

as to the specific amounts of the award - $166,957 for DMS, plus interest at 6% from July 2008,

and $120,083 for Mr. McUmber, plus interest at the rate of 6% from July 2008.  Defendant's

Exh. B, § 9.  These amounts, the Court finds, were the direct result of the Debtor's failure to

account for the Dot Gov contract proceeds to his co-venturers, DMS and Mr. McUmber.  The

amounts were established in the arbitration, and cannot be questioned here as a matter of

collateral estoppel.  To be clear, the Court accepts the specific amounts established by the

arbitration award as a matter of collateral estoppel, but the Court makes its own, independent

finding of a failure to account, and a defalcation by the Debtor while acting in a fiduciary

capacity, with respect to these specifically identified amounts, pursuant to 11 U.S.C. § 523(a)(4).

  *ii.*  *The Post-Arbitration Award Amounts.*

  The post-arbitration amounts are a different story.  While the arbitrator used the phrase

"plus any additional amounts that Giordano has received that [DMS and Mr. McUmber] should

have received pursuant to the foregoing percentages," the arbitrator made no specific findings

with respect to these amounts.  Defendant's Exh. B, § 9.  The arbitrator's use of the phrase

"additional amounts" is too vague for this Court to find that the amounts were actually

determined in the arbitration.  It falls to this Court, therefore, to determine whether the Plaintiffs

have proven their damages to be non-dischargeable under 11 U.S.C. § 523(a)(4).

  To say that the Plaintiffs' post-arbitration award damage calculations were inconsistent

and difficult to follow would be an understatement.  The Plaintiffs relied on Plaintiffs' Exhibits

32 and 33, which were summaries of the amounts claimed to be owed, as well as Plaintiffs'

Exhibits 34 and 35, the DMS and McUmber proofs of claim in this case.  The submitted

documents were internally inconsistent, and, in many ways, incomprehensible to the Court.

Exhibits 32 and 33 included amounts that were already awarded in the arbitration award (the

2006, 2007, and 5/6th's of the 2008 damages were already in the arbitration award).  Moreover,

Exhibit 32 includes a reference to the "High System" contract, which the Court understood was

an add-on to the Dot Gov contract.  It still isn't clear how the High Systems contract fit in to the

Plaintiffs' damages scenario.  Additionally, Exhibits 32 and 33 were just one page summaries of

what the Plaintiffs claimed were owed to them.  No support for these amounts – in particular,

bank deposits into a bank account or accounts controlled by Mr. Giordano – was ever introduced

by the Plaintiffs into evidence.[12]

The Proofs of Claim, Plaintiffs' Exhibits 34 and 35, only added to the confusion, since

the numbers in the Proofs of Claim were entirely inconsistent with, and not reconcilable with, the

numbers in Exhibits 32 and 33.  Although not clear from the face of Exhibit 32, the Plaintiffs

assert that Exhibit 32 should be read to mean the following:

| | |
|---|---|
| $166,957.19 | Arbitration Award |
| 1,422.41 | 1/6th of 2008 (not previously included in the Arbitration Award)[13] |
| 11,804.70 | 2009 |
| 9,620.97 | 2010 amount of $238,680.85, less $229,059.88 for High System |
| 12,100.79 | 2011 |
| $201,906.06 | TOTAL |

Plaintiffs' Exhibit 34, the DMS Proof of Claim, on the other hand, shows a total of

$184,266.42 (plus interest and legal fees) due to DMS on the Dot Gov Contract.  It is possible

that the difference between the Exhibit 32 number and the Exhibit 34 number may be accounted

for by funds received by DMS from the Fairfax County Circuit Court interpleader action, but this

was not explained to the Court, nor were the amounts accounted for or introduced into evidence,

in terms of bank deposits, canceled checks, or the like.

---

[12]   Exhibits 32 and 33 were not introduced into evidence at the trial.  However, because both parties relied on these Exhibits in their closing arguments, the Court will admit them into evidence so that the record is complete.

[13] The 1/6 is derived from the fact that the arbitration award was in November, so two months of 2008 are not accounted for in the award.

Similarly, Exhibit 33, as explained to the Court, would show the following for amounts due to Mr. McUmber:

| | |
|---|---|
| $120,083.00 | Arbitration Award |
| 21,805.00 | 1/6th of 2008 (not previously included in the Arbitration Award) |
| 181,005.40 | 2009 |
| 147,521.51 | 2010 amount of $255,039.41, less $107,517.90 for High System |
| 172,818.09 | 2011 |
| $643,233.00 | TOTAL |

Yet, Mr. McUmber's Proof of Claim shows that $374,852.05 in principal is owed to him. Plaintiffs' Exh. 35.  Again, this might be accounted for by payments made to Mr. McUmber pursuant to the Fairfax County interpleader action, but it is not clear to the Court how much was paid to Mr. McUmber, or when any such amounts were paid.  The Court is left with irreconcilable numbers between the two sets of Exhibits, and the Court will not speculate as to what accounts for the differences.

The flaw in the Plaintiffs' evidence on the post-arbitration award amounts is that, in order to prove the amounts of money paid by the GSA to NTI, the Plaintiffs relied exclusively on evidence that they assert was downloaded from the GSA's website.  Plaintiffs' Exhibits 32 and 33 use these alleged payment amounts as a starting point, and assume that NTI paid the funds over to Mr. Giordano.  There was no showing at the trial, in the form of bank statements, expert accounting testimony, or other competent evidence, that Mr. Giordano ever actually received these funds from NTI.  Critically, the Plaintiffs did not call Mr. Abbate, NTI's president, to testify (other than with respect to the reading of portions of Mr. Abbate's deposition testimony into evidence, which was not helpful, and did not discuss the payment of any funds to the Debtor by NTI).  Although the Plaintiffs called Mr. Giordano as an adverse witness in their case in chief, he did not testify that he received these funds to the Plaintiffs' detriment.  Proof of just how

much the Debtor received in Dot Gov contract proceeds, and thereafter failed to pay over to the

Plaintiffs, post-arbitration award, was utterly lacking. Accordingly, the Court cannot find that

Mr. Giordano converted the post-arbitration award funds to his own use.

The Court is unable to say with any certainty what the amounts were that the Debtor

converted to his own benefit, to the detriment of the Plaintiffs, in the post-arbitration period.

Accordingly, the Court finds that any amounts in excess of the amounts specifically stated in the

arbitration award - $166,957 for DMS, plus interest at 6% from July 2008, and $120,083 for Mr.

McUmber, plus interest at the rate of 6% from July 2008 - are not exempt from dischargeability

under 11 U.S.C. § 523(a)(4).

*III.     Count III – 11 U.S.C. § 523(a)(4) (Embezzlement or Larceny).*

In Count III, the Plaintiffs claim that the Debtor is guilty of embezzlement or larceny

under 11 U.S.C. § 523(a)(4). Embezzlement is "'the fraudulent appropriation of property by a

person to whom such property has been entrusted, or into whose hands it has lawfully come.'"

*Direct Capital Group, LLC v. Hadley (In re Hadley)*, No. 09-07141-FJS, 2011 Bankr. LEXIS

3194, at *34 (Bankr. E.D. Va. Aug. 19, 2011) (citing *KMK Factoring, L.L.C., et al. v. McKnew*

(*In re McKnew*), 270 B.R. 593, 631 (Bankr. E.D. Va.2001)). Larceny is defined as the

"'fraudulent and wrongful taking and carrying away of the property of another with intent to

convert such property to the taker's own use without the consent of the owner.'" *In re Criswell*,

52 B.R. 184, 202 (Bankr. E.D. Va. 1985) (quoting *In re Graziano*, 35 B.R. 589, 594 (Bankr.

E.D.N.Y. 1983)). *See also Caviness v. Lane (In re Lane)*, 445 B.R. 555, 565 (Bankr. E.D. Va.

2011).

26

A.  *The $40,000 and the $20,000 Checks.*

As noted above, the Court finds that the Debtor was acting in a fiduciary capacity with respect to the NTI funds.  *See supra* pp. 19-21.  The Debtor simply took the $40,000 and the $20,000 when he was not entitled to the funds.  His justification for taking the $40,000, that it was a bonus approved by him and Mr. Watson, is nothing more than a *post hac* rationalization for a wrongful act.  The Court found, above, however, that DMS received the benefit of $55,000 in the form of the purchase of the Watson stock.  Modified Final Award, Defendant's Exh. B, § 3(a); Plaintiffs' Exh. 22, § 3(a).

Further, as noted above, the Court must accept as unrebutted the testimony of the Debtor, to the effect that the $20,000 was in satisfaction of Mr. Watson's loans to the company and his expenses.  *See supra* p. 24, n.13.  This was contested by the Plaintiffs, but the Plaintiffs submitted no evidence that rebutted Mr. Giordano's testimony in this regard.  Significantly, Mr. Watson never testified.  Further, there was unrebutted evidence that Mr. Watson had loaned the company money from the outset.  Defendant's Exh. P, Informal Action by the Board ("[T]he Corporation acknowledges that Anthony J. Watson has loaned the Corporation the sum of $28,406").  Mr. Giordano testified that he got the company a "good deal" in settling the Watson loan and expenses for $20,000.  No evidence was submitted to rebut this claim.  Accordingly, the Court finds that the $20,000 is not exempt from dischargeability under 11 U.S.C. § 523(a)(4).

The Court finds that the remaining $5,000, however, is non-dischargeable under all three prongs of Section 523(a)(4) – defalcation while acting in a fiduciary capacity, embezzlement and larceny.  First, as noted above, the Debtor was a fiduciary with respect to the funds.  He took the funds without his co-venturers knowing it, and then attempted to justify it by claiming that it was approved.  Further, the funds were entrusted to him by the Plaintiffs.  The Debtor occupied a

27

position of confidence and trust with respect to funds.  He simply took money that was not his.

Accordingly, he is guilty of embezzlement and larceny with respect to the $5,000 that he

retained.

    *B.  The Dot Gov Contract Proceeds.*

Having found that the pre-arbitration award Dot Gov contract proceeds, in the amounts of

$166,957 for DMS, plus interest at 6% from July 2008, and $120,083 for Mr. McUmber, plus

interest at 6% from July 2008, are non-dischargeable as a defalcation while acting in a fiduciary

capacity, the Court similarly finds that these amounts were the product of embezzlement or

larceny.  Mr. Giordano was entrusted with complete control of these funds by DMS and Mr.

McUmber.  Moreover, he asserted possession and control over the funds to the detriment of the

Plaintiffs.  These amounts are non-dischargeable, as the product of embezzlement or larceny,

under 11 U.S.C. § 523(a)(4).

    *IV.       Count IV – 11 U.S.C. § 523(a)(6)(Willful and Malicious Injury to Property).*

The Plaintiffs' final claim is that that their claims are excepted from the Debtor's

discharge as a "willful and malicious injury by the debtor to another entity or to the property of

another entity."  11 U.S.C. § 523(a)(6).  The Supreme Court explained that "willful," as the term

is used in § 523(a)(6), requires "a deliberate or intentional *injury*, not merely a deliberate or

intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977,

140 L.Ed.2d 90 (1998) (emphasis in original).  The requirement that the conduct be  "malicious,"

however, does not require that a debtor bear subjective ill will toward, or specifically intend to

injure, his or her creditor; it is sufficient that a debtor's injurious act is done "'deliberately and

intentionally in knowing disregard of the rights of another.'"  *First Nat'l Bank of Md. v. Stanley

(In re Stanley)*, 66 F.3d 664, 667 (4th Cir. 1995) *(quoting St. Paul Fire & Marine Ins. Co. v.*

*Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985)).  The proper focus is not on the Debtor's "good

intentions," but whether he exercised dominion and control over funds that he knew belonged to

another.  *First Nat'l Bank v. Stanley (In re Stanley)*, 66 F.3d at 668.  The burden of proof is on

the objecting creditor, and the standard of proof is preponderance of the evidence.  *See supra* p.

13; *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

   *A.  The $40,000 and the $20,000 Checks.*

   As noted above, the Debtor issued the $40,000 check as an unauthorized bonus.  While

DMS obtained the benefit of $55,000 of the funds (*see* Modified Final Award, Defendant's Exh.

B, § 3(a); Plaintiffs' Exh. 22, § 3(a)), the Debtor retained $5,000 of the funds for his personal

benefit.  Under the circumstances, the Court has no hesitancy in concluding that this was a

conversion of the funds.  Further, the Court finds that the conversion was willful and malicious.

It was done on the eve of the Board meeting with no notice to the other directors.  Moreover, Mr.

Giordano attempted to execute these transactions in a way that would make the funds

"untraceable."  And, it was done in a way to leave Mr. Watson on the Board in order to further

the Debtor's aims with respect to DMS.  The $5,000 is therefore non-dischargeable under

Section 523(a)(6).[14]

   *B.  The Dot Gov Contract Proceeds.*

   The Court finds that the pre-arbitration award amounts - $166,957 for DMS, plus interest

at 6% from July 2008, and $120,083 for Mr. McUmber, plus interest at 6% from July 2008 – are

non-dischargeable under Section 523(a)(6).  There is no question that the Debtor intentionally

refused to pay these amounts over to DMS and Mr. McUmber in knowing disregard of their

rights to the funds.  The Debtor's defense was that "he could not have known of the arbitration

---

[14]  Again, the Court finds that the company received the benefit of the $35,000 (repurchase of Mr. Watson's stock), and the $20,000 (satisfaction of the Watson loan and expense claim).

award" back in the July 2006 to November 2008 time frame.  This much is true, of course, but it is not the arbitrator's award that made the refusal to pay non-dischargeable; it is the Debtor's willful and knowing refusal to pay the funds over to DMS and Mr. McUmber.  The Debtor asserts that he was "going back to the Teaming Agreement."  The Court simply does not accept this explanation.  The Debtor operated under the 49/23/23% agreement for the entire period of the Dot Gov contract, up until July 2006.  He acted not just in derogation of the contractual agreement beginning in July 2006 when he refused to pay DMS anything more than 47 ½% and refused to pay Mr. McUmber anything at all, but he also acted willfully and maliciously, knowing that they were entitled to these funds.  The pre-arbitration award amounts - $166,957 for DMS, plus interest at 6% from July 2008, and $120,083 for Mr. McUmber, plus interest at 6% from July 2008 – are therefore non-dischargeable under Section 523(a)(6).

With respect to the post-arbitration award amounts, i.e., the Dot Gov contract proceeds after July 2006, again, the Court cannot tell with any certainty (or even with any educated guesswork) the amount the Debtor is alleged to have received and not paid over to the Plaintiffs. Accordingly, the Court will find that any amounts alleged to have been received by the Debtor post-July 2006 are not exempt from dischargeability under Section 523(a)(6).

V.      *The Debtor's Defense of Res Judicata.*

The Debtor argues that the claims that are now the subject of the Plaintiffs' Complaint were all resolved in his favor in the arbitration proceeding, and therefore, are *res judicata* at this point.  Specifically, the Debtor asserts that the Complaint that the Plaintiffs filed in the U.S. District Court, Defendant's Exhibit E, which ultimately went to arbitration, encompassed the current fraud-based claims, and that the arbitrator ruled that "any other claims not specifically addressed herein are denied."  Defendant's Exh. B, § 17.  However, this completely ignores the

30

fact that the arbitrator found against the Debtor on the key issues of whether there was an agreement, whether the Debtor breached that agreement, and whether the Plaintiffs suffered damages as a result. *See id.* at § 9. It is entirely possible that the arbitrator, having found an agreement, breach, and resulting damage, simply did not see the need to address the fraud issues raised in the Complaint.

Further, although a number of the Counts in the Complaint are similar to what is at issue here (*see, e.g.*, Complaint, Defendant's Exh. E, Count V (Breach of Fiduciary Duties), and Count X (Conversion)), there is no basis for a finding of *res judicata* under the Supreme Court's ruling in *Brown v. Felsen,* 442 U.S. 127 (1979). In *Brown v. Felsen,* the Supreme Court rejected the Debtor's claim of *res judicata* where the creditor's claim had been litigated to a judgment in State court on a contract claim. *Id.* at 138-139 ("[W]e reject respondent's contention that *res judicata* applies here and we hold that the bankruptcy court is not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of respondent's debt"). The Court specifically rejected the argument that the creditor's claim under Section 17 of the Bankruptcy Act (the predecessor to the current day Code Section 523) *could have* been litigated in State court. *Id.* at 137. The Supreme Court noted that Bankruptcy Courts are uniquely situated to make determinations of non-dischargeability and that, in the ordinary case, issues of fraud or conversion need not be submitted to State courts in order to reach a judgment. *Id.* at 138. Accordingly, the Debtor's defense of *res judicata* is rejected.

VI.     *The Defense of Set-Off for the Legal Fees Paid By Mr. Giordano to his Counsel.*

Throughout the trial, the Debtor maintained that he paid his counsel, Mr. Bledsoe, roughly $53,000 in connection with the arbitration, and that he was entitled to recover those funds pursuant to Section 16 of the arbitrator's Modified Final Award. However, the Debtor did

31

not list the $53,000 in his Schedule B in this case, nor did he claim an exemption for these funds

on his Schedule C.[15]  An asset that is not listed remains an asset of the bankruptcy estate until

administered or abandoned by the Trustee.  11 U.S.C. § 554(d).  The $53,000 receivable, if there

is one, is owned by the Chapter 7 Trustee, not by Mr. Giordano.  Mr. Giordano cannot use the

Trustee's property to set off his own non-dischargeable liability.  *In re White*, No. 09-50511,

2011 WL 5509406, at *7 (Bankr. S.D. Ill. Nov. 9, 2011) (Debtor cannot use claims belonging to

the Trustee to set off a non-dischargeable judgment); *Parkdale v. Sims (In re: Sims),* 2009 WL

4255555 (Bankr. D. Kan. 2009) (Debtor lacked standing to assert claim for setoff); *Bemas*

*Constr., Inc. v. Dorland (In re Dorland),* 374 B.R. 765, 774 (Bankr. D. Colo. 2007) (same).

Accordingly, the Court will not allow a setoff of Mr. Giordano's non-dischargeable liability in

the amount requested ($53,000).

     VII.     *The Legal Fees Claimed by DMS.*

     Finally, the DMS Proof of Claim includes $153,116 in post-arbitration award, pre-

bankruptcy petition legal fees incurred by DMS in seeking enforcement of the D.C. Judgment.

Plaintiffs' Exh. 34, p. 2.  As noted, the arbitrator did not award DMS any legal fees as against

Mr. Giordano.  To the contrary, the arbitrator ordered DMS to pay all of Mr. Giordano's legal

fees in the arbitration.  The basis for the claimed legal fees is the Shareholder's Agreement,

Plaintiffs' Exh. 2, §§ 6(a)(v) and 13(c).  However, Section 6(a) has to do with the execution of a

Note that the corporation may issue in connection with the redemption of a shareholder's shares

*Id.* at §6(a) ("Payment of the purchase price for the Seller's Shares, as determined under

paragraph 5, shall be made as follows . . .").  Section 13 obligates the shareholders to use their

---

[15]   Plaintiff's counsel requested, at the beginning of the trial, that this Court take judicial notice of the Debtor's
Schedules in bankruptcy, and the Debtor did not object.  Accordingly, the Court takes judicial notice of the
Schedules in the bankruptcy case.  Fed.R.Evid. 201; *In re Bernick*, 440 B.R. 449, 450 (Bankr. E.D. Va. 2010)
(indicating that "the court may take judicial notice of the debtor's schedules").

best efforts to promote the company's business, not to compete with the company (with a company "which is engaged in a business similar to that of the Corporation"), and the like.

The problem for DMS is that none of the post-Judgment collection efforts had anything to do with paragraphs 6 or 13 of the Shareholder's Agreement. It is abundantly clear that the arbitration award was based on the GSA-NTI Fee Sharing Agreement, not the Shareholder's Agreement. Defendant's Exh. B, § 9; Plaintiffs' Exh. 22, § 9. The arbitration award was based on the fact that the parties had agreed on a split of the Dot Gov contract proceeds – 49% to DMS, 23% to Mr. Giordano, 23% to Mr. McUmber – and that the Debtor wrongfully withheld the proceeds from the Plaintiffs. The Shareholder's Agreement, while it may have been the basis for arbitration in the first place, was not the basis for the arbitrator's award.

Accordingly, the Court finds that the $153,116 in legal fees asserted in the DMS Proof of Claim to be dischargeable.

## Conclusion

For the foregoing reasons, the Court rules as follows:

A. Count I will be dismissed.

B. On Counts II and III, the Court determines that the D.C. Judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) as to: (a) the $5,000; and (b) the pre-arbitration award amounts, $166,957 for DMS, plus interest at 6% from July 2008, and $120,083 for Mr. McUmber, plus interest at the rate of 6% from July 2008. The balance of the post-arbitration award amounts and the Plaintiffs' claim for attorney's fees are dischargeable.

C. On Count IV, the Court determines that the D.C. Judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) as to (a) the $5,000; and (b) the pre-arbitration

award amounts, $166,957 for DMS, plus interest at 6% from July 2008, and $120,083

for Mr. McUmber, plus interest at the rate of 6% from July 2008. The balance of the

post-arbitration award amounts and the Plaintiffs' claim for attorney's fees are

dischargeable.

An appropriate Order shall issue, consistent with the terms of this Memorandum Opinion.


Date: _____                    _____
                                        Brian F. Kenney
                                        United States Bankruptcy Judge


Copies to:

Dawn C. Stewart, Esquire
The Stewart Law Firm, PLLC
1050 Connecticut Ave. N.W.
Tenth Floor
Washington, DC 20036
Counsel for the Plaintiffs

Christopher L. Rogan, Esquire
RoganLawFirm, PLLC
30-D Catoctin Circle, S.E.
Leesburg, VA 20175
Counsel for the Defendant